Mr. Killian Yes, good morning, Your Honors, and may it please the Court. Coal Act is the only federal statute that establishes a health care benefit plan, two of them, in fact, and that guarantees benefit levels. Those plans are administered by my clients, the trustees, and they are funded by a mix of federal dollars and by premiums that are assessed on coal companies as long as those companies remain in business. And then the Act, Congress, through the Act, imposed a number of restrictions to prevent coal companies from getting out of those obligations. In the decision below, the Bankruptcy Court held that notwithstanding the special statutory protections in the Coal Act, that it may permanently eliminate all of a coal company's obligations under the Act before it goes out of business. In reaching that conclusion, the Bankruptcy Court Well, but the Bankruptcy Code allows that, right? That is the question, Your Honor. We disagree that the Bankruptcy Code allows it in the way that the Bankruptcy Court undertook it. Can you distinguish your case on the facts from the Eleventh Circuit case in Walter? You just say it's wrong from wrong to wrong to decide it. That's correct. I mean, the facts are, the material facts are not different. This case presents an identical, three identical questions of law that were decided against my clients by the Eleventh Circuit in the Walter case. As I understand it, and correct me if I'm wrong, the coal miners are getting their money, their benefits regardless, and so this is really about whether the companies are going to continue to contribute, the bankrupt entities, or, and if they don't, the shortfall is going to be picked up by the federal government. Is that the effect of, say, the Eleventh Circuit? The Eleventh Circuit says at the end of the decision, the miners are still going to get their money, just the taxpayers are going to have to pay more now. There is a limit at which the taxpayers are on the hook. We're not at that limit yet. The Abandoned Mine Reclamation Fund is where much of the federal dollars come from. That fund is being depleted as mines are being reclaimed, and over time, my clients, the two funds that they administer, will have access to reduced federal funding, and so So that's the concern of your Exactly. It's a longer term concern, Your Honor. Well, let me, my question leads to this. In the Eleventh Circuit case, I don't think here, has anyone asked for the federal government to submit its views? Because one, its tax dollars are at issue, and two, we're talking about two federal statutes that are arguably in conflict, and the federal government might have a view about which one prevails. To my knowledge, no one has solicited a position from the federal government on this. And you don't know if they're taking a DOL or any other No, I don't know. I don't know. I would have to speculate that the federal government would rather that the companies pay than that they pay, but there's obviously more interest at stake. I'd like to start, Judge Costano, there are two statutes at issue in this case, three really if you throw in the Any Injunction Act, and I'd like to start with what I think is the cleanest and simplest path to a reversal, which has to do with the question of whether or not the COLACT obligations themselves are negotiable, because 1114, the provision in the Bankruptcy Code, allows modification only of negotiable obligations. At this point, I think it is undisputed that 1114 allows for the modification only of negotiable obligations. The Eleventh Circuit held that in its decision when it ruled against us, and Westmoreland on pages 34 and 35 of its brief says explicitly that it agrees that only negotiable obligations may be modified under 1114. And that follows, and I think it's worth just focusing on the text of 1114 for a moment, that follows from how 1114 is set up. 1114E is a subsection that says all debtors who have retiree benefits must pay those retiree benefits unless they reach an agreement to modify or terminate those, that's under 1114F, or if the court orders a modification under 1114G. 1114G, however, notes that the court has no power to order a modification unless the authorized representative refuses to enter into an agreement without good cause. So in other words, if there is good cause to reject the modification, then the court may not enter the order modifying it itself. And so this negotiation, this potential agreement between the authorized representative and the debtor is sort of the fulcrum on which all of modification pivots under 1114. But because of the way Congress wrote the COLE Act, these obligations may not be negotiated. And I point the Court to Section 9722, which specifically forbids any transaction, any transaction, if a principal purpose of that transaction is to evade or avoid liability under this chapter. And so that provision asks the Court just to imagine if an authorized representative agrees with the coal company, you know what, you don't have to pay what the Act requires. That would be a transaction, a principal purpose of which, it doesn't have to be the, a principal purpose of which is to evade or avoid COLE Act liability. And so the Act would nullify that agreement that was entered into between the authorized representative and the debtor. If the case moved over to the Bankruptcy Court, it's got to make a decision, I mean, under the statute that it's following, to either do something with the retirement benefits or nothing, or I would think somewhere in between. So you're saying the Bankruptcy Court couldn't say, look, I want you boys to sit down and see if you can't work something out, short of me just shutting the benefits down? That is what we're saying, Judge Davis, just as the Bankruptcy Court can't tell an operating debtor, you know what, for the next five months, you don't have to pay Social Security taxes because it's going to be too onerous on your estate to pay the costs that you incur. Congress wrote the COLE Act so that these premium obligations are contingent on operation. And so we're dealing here under Chapter 11 with an operating debtor in possession, and while that debtor continues to operate, it continues to be assessed and incur on a monthly basis premiums under the Combined Fund and under the 1992 plan. And so, yes, Congress did go a step further, Judge Davis, and made these statutory obligations extra specially protected because it forbids these types of negotiations. And so, just to finish the point— Well, this sort of goes back to my question, if there are these negotiations, I find it No, it's someone appointed by the Bankruptcy Court. Hold on. It's beneficiary. Right. The Bankruptcy Court has to appoint someone if it can't be agreed. Right. And then it's the companies, obviously, at the table. And yet no one from the federal government's at the negotiating table, even though they're the ones that are most directly impacted if there is this modification. Other than the U.S. trustee who may be involved in the case now, the Department of Justice or U.S. Attorney's Office, they don't have a claim in the same way. These other folks can say, we're going to negotiate away all these obligations to the federal government. And that's, to us, the absurdity of this whole negotiation process. Because if the agreement that is reached between the authorized representative and the coal company could take place, well, then it's always going to reduce the payments to zero because the feds are always going to—until we reach this limit, they're going to provide a dollar-for-dollar substitution. And so it becomes an immediate turnoff of paying the premiums that Congress said you have to pay. And that's why I focused the court on this, the way 1114E, F, and G are set up. Because if there is good cause for the representative to say no, then the court never gets to enter that order that itself modifies it. And 9722 is that good cause. 9722 would invalidate the agreement if it went into effect. And so if the agreement would be invalidated, of course there's good cause to say no. And if there's good cause to say no, the bankruptcy court can't enter that order. The Eleventh Circuit agreed with us on all this and just disagreed, ultimately, on the negotiability of Coal Act obligations. And I respectfully believe that the Eleventh Circuit fundamentally misunderstood what was going on in the negotiation. The single example that the Eleventh Circuit cited was this Bethlehem Steel settlement that the trustees entered into in the early 2000s. That was a settlement in a bankruptcy, and if the court reads the decision of the bankruptcy court there at page star 2, it's unpublished, the court would note that Bethlehem Steel had already gone out of business at the time of the settlement, meaning it had stopped accruing Coal Act obligations on a monthly basis, because that's how Congress writes the Coal Act. As soon as you go out of business, you don't accrue continuing obligations. And so the settlement, the key settlement that the Eleventh Circuit focused on was a purely retrospective settlement. And Your Honors, in our view, that's similar to when the IRS enters into a settlement with a taxpayer. And the taxpayer has accrued a tax liability, say, for 2018, and then is unable to pay. Well, of course you could negotiate over that distinct claim, that cause of action. You could take into account ability to pay, whether the tax was properly assessed. Those are appropriate settlements of statutory obligations. What 1114 does is very different. We're not talking about settling claims that have already been assessed, I should say premiums, that have already been assessed on the coal company. 1114 is a prospective modification. It says once you reach this agreement, your retiree benefit obligations are immediately modified and they will be forever modified. That's what Section 1129A.13, which is about plan confirmation, says. It says any order or modification that happens to your retiree benefits during bankruptcy has to be put into your confirmed plan and stick with you after bankruptcy. And so when you put these two things together, 1114 is about permanently and prospectively changing obligations. So you're saying all these settlements, there's apparently been a number of settlements, they're all retrospective, looking at past benefits that have... Well, my understanding, the only one that's been cited to us is the one that involves Bethlehem Steel. But my understanding, in conferring with my client, is that they tend to deal with these settlements about assessed claims at the end of a bankruptcy, as just happened. They have not, to our knowledge, entered into a prospective agreement that says, you know, this amount of money on a monthly basis for the rest of your existence, we're going to cut that 50% because we don't want you to go into bankruptcy. They've never negotiated prospectively. And that's what the 1114 negotiation ultimately is. And so in our view, once you accept that 1114 applies only to negotiable obligations, you take a look at how the COLE Act is set up that it essentially requires, as a statutory matter, this ongoing obligation akin to taxes that are incurred by operating businesses. And then hedges that in even more with Section 9722 that forbids any transaction with the principal purpose of evading COLE Act liability. We can't see how you could reach the conclusion that these are negotiable benefits. If the court did, however, that would present a very difficult question under the Anti-Injunction Act, because every court except the 11th Circuit has held that the COLE Act obligations are taxes that are protected by the Anti-Injunction Act. How many of those decisions post-date the NFIB? Just Walter, Your Honor. And so all the ones are pre-NFIB. But we don't think NFIB fundamentally changed how the Anti-Injunction Act applies. So let me try to set this up. We all agree, my clients agree, and I think Westmoreland agrees, that the label that Congress assigns to a particular statutory exaction is very important in applying the Anti-Injunction Act. We're not saying that the label is irrelevant. But what we are saying is that there's more than just the label tax that is protected by the Anti-Injunction Act. And that's because Congress wrote the Anti-Injunction Act not to apply simply to an exaction that is labeled tax. It says any tax, which would include exactions that are taxes but not called taxes. And even NFIB recognized that when it said that there are some penalties, some exactions called penalties in the tax code, that are in fact treated as taxes for the Anti-Injunction Act purpose. And similarly, we've cited to the court cases from the early part of the 20th century, like Lipke v. Letterer, where there were exactions that were labeled tax in the statute, and the Supreme Court said, no, those are actually penalties, and you can bring a challenge to those under the, consistent with the Anti-Injunction Act. The question is, ultimately, what is the label that Congress chose, and what does that indicate about Congress's intent? Most of these cases deal with an exaction that's called tax, or an exaction that's called penalty. But in between those extremes, there's a range of other labels. And one we're dealing with here is premium. And in our view, premium has the same effective meaning as a tax. It's an additional sum that is charged upon an individual. That is a tax. It's involuntary. And the purpose of this is to raise revenue. Contrast that with a penalty. The purpose of a penalty is not to raise revenue. The purpose of a penalty is to shape behavior and stop people from taking some action. And so, a successful penalty raises no revenue, whereas a successful tax and a successful premium raise revenue on a regular basis. The coal companies that pay these premiums obtain no benefit in exchange for the payments, and so you couldn't call it just like a fee, a transaction fee of some kind. It is absolute, and it's unavoidable, just like a tax, except when the business decides to go out of business. Well, that's the same as a real estate tax. As soon as you dispose of real property, you no longer pay the real estate taxes on that property. And so you do have some broad control, but as long as you have a continued obligation, you continue to incur the premiums under the Coal Act, just as you would incur a real estate tax. It's codified in the Internal Revenue Code, which the Supreme Court has said is necessary for something to be a tax protected by the Anti-Injunction Act. We're dealing with the last chapter of 26 U.S.C. here, and that's where the Coal Act has been codified. And the Fourth Circuit has held that if a coal company disagrees about its premium payments, it could bring a tax refund action. That's the Pittstein case. And so, yes, these cases predated NFIB, but NFIB was dealing with the difference between tax and penalty. It told us to look at the words Congress used and then decide, is this supposed to be any tax? And a premium, as I've just tried to describe, is a tax. But in the posture of this case, when this came up interlocutory, there was no, no deal had been made about these obligations. So why is this action an action to, assuming they are taxes, why is this an action to restrain taxes? Walter was different. Walter was the, after the end of the bankruptcy decision. So our action was an adversary proceeding that was filed in advance of the 1114 motion that the debtor ultimately filed here, because the parties wanted to have an initial determination about the scope of the bankruptcy provisions. It was, as the Eleventh Circuit noted, an important and difficult question that had not been decided by this Court. And so, you know, we wanted to get out on these, ahead of these questions of law. Our argument was that the Bankruptcy Court lacks authority when an 1114 motion is filed because of the Any Injunction Act. And so it was in the context of saying, you can't do that, that we said the Any Injunction Act acts as a prohibition on what would be the motion that gets filed later on. Your initial time has expired. I see that, Your Honor. I'll reserve the remainder for rebuttal. Yes. Save time. Thank you. Mr. Hicks. Thank you, Your Honor, and may it please the Court. Section 1114 of the Bankruptcy Code was enacted to give Bankruptcy Courts tightly circumscribed authority to modify retiree health care benefits during Chapter 11 proceedings. The Bankruptcy Court here properly exercised that limited authority when it approved an agreement to modify debtors' COAL Act obligations, thereby preventing liquidation of the companies and preserving thousands of jobs. In the trustees' view, however, the Bankruptcy Court had no authority at all under Section 1114 to approve that agreement because COAL Act obligations are categorically outside the purview of Section 1114. Indeed, in the trustees' view, even if all parties agreed to a 1 percent reduction in Section 1114 to implement even that extremely modest, agreed-upon modification, instead, the company must liquidate, the mines must close, and every single job must be lost. That cannot be the law, and fortunately, as every single court to address the issue has concluded, it is not the law. And I'd like to start where my friend on the other side began in their brief, which is whether these are even retiree benefits to begin with. And I think that is answered by this Court's decision in In re Rogers, which says that it is a fundamental canon of statutory construction that in the absence of a statutory definition, we give terms their ordinary meaning. And here, we start with the text of the statute at issue, which is 1114, 1114a. We see that it says maintained in part. Maintained is not defined by the bankruptcy code or in Section 1114. So we look to the ordinary meaning, and the ordinary meaning under multiple definitions in dictionaries is to bear the expense of, furnish the means for subsistence, support, preserve from failure or decline. That is the ordinary meaning, and it applies foursquare here. Now, moving on to... You're saying an employer maintains in part Medicare or Social Security, and they help fund it? I don't think that those would fall under 1114a's definition of maintained in part because for several reasons. First of all, Social Security would be more like a pension obligation that wouldn't fall under it to begin with. But number two, both Social Security and Medicare, they go into the general treasury fund. There's not a plan or program that is required under 1114. And also, the third reason is that the bankruptcy code actually has protections for those particular types of exactions. So it's not as if they could use 1114a to get out of that. And actually, I want to use that to segue into what I think is now the main argument by the trustees, even though it's the second argument in their brief, which is this idea about statutory obligations being completely outside the purview of 1114. I think that fails for a couple of reasons. The first is that once it is established that these COLACT obligations are retiree benefits under section 1114a, it follows that they are subject to negotiation and modification under the rest of 1114, because the rest of section 1114 repeatedly refers to those same retiree benefits as subject to negotiation and modification. So if you look at 1114e, the debtor shall not modify any retiree benefits except the court may order modification of such benefits, or the authorized representative may agree to modification of such benefits. 1114g, the court can provide, quote, for modification in payment of retiree benefits. So if COLACT obligations are retiree benefits, and we think that they are under the plain text of 1114a in traditional canons of statutory construction, then they are negotiable and modifiable per the rest of 1114. There's nothing in 1114 or 1114a that says that there is some sort of special category of retiree benefits that are retiree benefits, but they are somehow not subject to the rest of 1114. Now there's a second and perhaps even more fundamental reason why this idea that because it's a statutory obligation, it's completely beyond the purview of 1114 doesn't work. And that is that whatever you might think of statutory obligations in the ordinary course, everything is different in bankruptcy. In bankruptcy proceedings, there are numerous decisions from courts of appeals that hold that statutory obligations can be modified or overridden or disregarded in bankruptcy proceedings because of the particular — What kind of statutes have those been? I'll give you some examples, Your Honor. And I'll give you three examples. I want to give you the cites first just so you have them. It's the In re Chateau Gay case out of the Second Circuit, 944 Fed 2nd, 997. That involves CERCLA, and I'll explain these a little bit more. The second is In re Trump Entertainment Resorts, 810 Fed 3rd, 161 out of the Third Circuit. And the last is the In re Leckie case out of the Fourth Circuit, 99 Fed 3rd, 573. So starting with In re Chateau Gay, that was a case in which the Second Circuit held that the statutory obligation under CERCLA to reimburse the EPA for response costs is dischargeable in bankruptcy. And the Second Circuit even referred to this as obligations arising out of public regulation that it said the bankruptcy code, quote, is intended to override many provisions of law that would apply in the absence of bankruptcy. If the code creates limits on the extent of environmental cleanup efforts, as the EPA had argued, the remedy is for Congress to make exceptions to the code to achieve other objectives that Congress chooses to reach rather than for courts to restrict the meaning of across-the-board legislation like a bankruptcy law in order to promote objectives evident in other statutes. Now, the Third Circuit, in the Trump case, this is a case involving the National Labor Relations Act. Under the NLRA, the NLRA statutorily prohibits an employer from unilaterally changing the terms of a collective bargaining agreement after its expiration. It creates a statutory obligation on employers to continue those terms of the expired CBA until a new one is reached or there's a bargaining impasse. And the question in that case before the Third Circuit was whether Section 1113 of the bankruptcy code, which is the analog to 1114, but in the CBA context, whether that Section 1113 overrides this statutory obligation such that the debtor can reject an expired CBA even though under the NLRA it must continue. And the Third Circuit said yes, and here's the language that it used here. When the employer's statutory obligations to maintain the status quo under the terms of an expired CBA will undermine the debtor's ability to reorganize and remain in business, statutory obligation yields to 1113. It is essential, this is at pages 173 and 174, it is essential that the bankruptcy court be afforded the opportunity to evaluate those conditions that can detrimentally affect the life of a debtor, whether such encumbrances attach by operation of contract or a complex statutory framework. And the last case I want to give you is In re Lecce, which, you know, even though 1113 is awfully on point because it's an analog to 1114, the In re Lecce case is completely on point, and it, in fact, is sort of sub rosa implicated in this case. So In re Lecce is a case from the Fourth Circuit, and the question here was whether a bankruptcy court can use a Section 363 sale to, quote, extinguish Coal Act successor liability, because, of course, under the Coal Act, it is a statutory requirement, a statutory obligation that anyone who is a successor to one of these companies, so if they acquired it, purchased it, what have you, has to pick up the liabilities. It's a statutory obligation. But the Fourth Circuit said in In re Lecce the bankruptcy court may, quote, order the sale of the debtor's assets free and clear of the debtor's Coal Act obligations. And, in fact, the funds argued in that case that to reach that holding, it would grant purchasers in bankruptcy settings a windfall, because such purchasers might have been liable for those Coal Act obligations if the sales had not occurred in the bankruptcy setting. And the Fourth Circuit said we reject that argument, finding that it is our duty to enforce the statutory scheme that Congress has erected. So I go through all these cases just to underscore that statutory obligations, whatever the case may be outside of the bankruptcy context, and we think that in this context, for the reasons we've already stated, it doesn't work anyway. But once you're inside the bankruptcy proceeding world, for all the reasons that these other courts of appeals have explained, statutory obligations most certainly can be modified and disregarded. And I think the most important thing to take away, perhaps, is that that's happening in this case. In this case, there was a Section 363 sale to a purchaser. Now, under the Coal Act, there should be successor liability for that purchaser. But because of the Fourth Circuit's decision in Wray-Leckie, that statutory obligation is not attaching to the purchaser. And, in fact, it's not even disputed in this case that those statutory obligations have been overridden by the bankruptcy code, by the bankruptcy code, by the Section 363. Are mine still operating? They are, Your Honor. They are. They are operating, but they would not be operating if Section 1114 was not allowed to be utilized by the bankruptcy court. That is undisputed. Let me ask you about the 1114 process. So you follow the motion. A negotiation gets set up between the debtor entities, and the retirees get some representatives to be at the table as well. Which of those parties has any strong interest to protect or continue Coal Act contributions for retiree benefits? Because, as you said at the beginning, pretty much everyone, oh, it's great, let's keep the mines running. And, of course, that's what a lot of people would want. So isn't the incentives always going to line up, and let's eliminate the contributions and let the government pick up the slack? Your Honor, I don't know what the particular, you know, back and forth of these negotiations is, but I do know that, you know, the negotiations don't just result in, you know, hey, have anything you want. I mean, this is a perfect example in this case. The companies, I believe, you know, came in with their initial proposal was just to terminate everything. And then what ended up happening after the bankruptcy court had to determine whether it had the authority, you know, we didn't even get to the Section 1114g process until well after this. I mean, you know, there was an adversary proceeding to determine the court's authority, and then only after that, everyone sat down and had a negotiation. And it didn't result in just, hey, you know, do whatever you want. There were actually — there was, as is undisputed, there was a good-faith give-and-take, and there were things given up, and the companies actually, you know, provided that was not in sort of the original proposal. So, you know, I don't know what the nuances of all the other negotiations have been, but at least for purposes of this case, it shows that it's not just a blank check and it's not just a sort of, hey, you know, let's just give it all — give it all away. And remember that — And the bankruptcy judge is involved, too. I was just about — Any final statements? Absolutely. I was just about to say that, remember, this is not a, you know, the parties get off in a smoke-filled room and come back and say, hey, bankruptcy court, you know, rubber stamp this. It's a very circumscribed authority that has — the bankruptcy court has to find that it is, number one, necessary for reorganization. Number two, all parties were treated fairly and equitably.  So this — this is — you know, there is rigorous court oversight of this entire process. And it's not something where, you know, the party — and I think if any bankruptcy court thought that there was just some sort of collusion going on or something where everyone was just trying to kind of offload this, you know, the bankruptcy court would have something to say about it. But no court ever has. Every court that has looked at this has given it the close scrutiny that the statute requires. In my remaining time, I want to touch a little bit on the Anti-Injunction Act — or actually, if I can get there, I want to talk a little bit about this 9722 argument that my friend across the aisle makes. You know, this applies to a sham transaction. And, you know, a principal purpose of the relevant transaction has to be to avoid Coal Act liability. Here, I don't even think there's been sort of an identification of what the relevant transaction was. You know, it — they don't seem to argue that it was the filing of the bankruptcy petition, and they don't argue that it was the sale of the company, although you would think that that's actually — you know, if there was any, you know, shenanigans going on here, that it would be that. Instead, they argue that it was the filing of the 1114G motion. And, you know, number one, as I referred to previously, that didn't even take place in this case until, you know, after the process that gave rise to this appeal. But putting that aside, you know, I — I struggle to understand how a — a motion filed in a court is, you know, a transaction in the sense that any of us would think of a transaction. You know, I don't know if the — I guess the counterparties would be the debtors and the court, but even then, you know, a principal purpose of that I don't think in any sense is evading Cole Act liability in the sense that 9722 is talking about. I mean, I think that, you know, there that the common sense thinking behind a transaction provision like that that you see in a lot of statutes is, okay, you know, under your — under the Cole Act, you can't set up a shell company that has an affiliate in the Caymans and then, you know, sends money over here, and so therefore you somehow got out — out of paying your — your obligations. I don't think it has any relation to a congressionally authorized mechanism in Chapter 11 bankruptcy proceedings, which is Section 1114. And if I can now just turn very briefly to the Anti-Injunction Act. We — we provide a number of reasons in our brief why we don't think that the Act even applies at the outset and that even if it did, that it would fall under the exception because there's really no — there's really no way to have an alternative means for obtaining relief here. But since my friend focused on just the question of whether these are even taxes in the first place and really focused attention on NFIB, with all respect, I just don't think that you can read NFIB in that manner. And I don't think that this Court has read NFIB in that manner. If you look at the Hoetze case, if I'm pronouncing that correctly, both NFIB and Hoetze strongly emphasize the choice of label in the statute. And in fact, Hoetze says that there has to be a, quote, compelling reason to ignore Congress's choice of label. Well, in this particular context, in the Cole Act, Congress used the word premium 87 times. And aside from that, it did use the word tax a few times. So this is not just a situation where it chose to use the word premium 87 times. It also used the word tax showing that it knew how to use the word tax if it really wanted to say that this is a tax, but it didn't. And so I think when you've got a situation where a statute is — and Congress has chosen to use the word premium 87 times, yeah, you need a really compelling reason to ignore that. And I just don't think — So how does that happen? Is it through a trust or an insurance company? Or is it — I mean, the money the employer pays in, where does that go? The money that the companies pay goes to a private fund. It does not go to the government. It does not come — go through the government. It goes directly to a private fund. And I think that's just another reason why, at the very outset, that the Anti-Injunction Act really has no applicability here, because this is not a situation where the money is going to the government. This is not a situation — in your typical Anti-Injunction Act case, you've got a party that's coming into court saying, I'm not going to pay that because I think it's totally unsubstantiated by the law. And I don't think this case maps onto that at all. We don't have a suit for the purpose of restraining collection of any tax. This is not a situation where somebody has gone in. And then, kind of bringing everything back to the Regan exception, if 1114 weren't available because of the Anti-Injunction Act — remember, the Anti-Injunction Act is really more a question about timing. It's about when can you bring your challenge to the underlying regulation or what have you. And so, for example, in the Florida Bankers case that my friend's site, Judge Kavanaugh, made this clear. He said, look, it's not about whether you can do it or not. You just can't do it now. You have to do it later. Well, in this case, there's no later. There really isn't a time or place that the debtors could ever obtain the relief under 1114 because, you know, they can't sort of pay the premiums and then go to district courts to try to get them back because, of course, 1114 is only available in bankruptcy court. But, you know, also, by the way, they would have liquidated by that point. There wouldn't be anyone left. So, you know, when you're thinking in terms about whether the Anti-Injunction Act even applies in the first place, you know, whether you want to look at it from the front door because this is not a suit for the restraining of the collection of any tax, or if you want to look at it from the back door, which is the Regan exception because there's no alternative means of obtaining relief, I think it simply doesn't apply in the first place. But even if it did, Congress used the word premium 87 times, and that's an awfully strong indication that it meant that it was a premium, not a tax. If there are no further questions. Thank you, Mr. Higgs. Thank you. Kagan for rebuttal. Thank you, Your Honors. I'd like to start with the 1114F point again. Mr. Higgs said we've not identified the transaction. Here it is. It is the negotiation between the authorized representative and the debtor. That is the transaction that 9722 forbids, that it would be a transaction whose principal purpose is to evade or avoid liability under the Cole Act. And in fact, that is how the Cole Act obligations ultimately were terminated in this case. After Judge Jones appointed a committee of three individuals, none of whom were actually beneficiaries of the Cole Act funds, they entered an agreement with the debtor. That agreement provided that the liabilities would be completely eliminated except for the $75,000 fund that has been reserved for whether we win or lose on this appeal. The court did not oversee that. They did not ever get to the 1114G point of needing a motion for a court-ordered modification because the three-person committee said, you know what? We're good with getting this down to zero. And that's the problem. That's the transaction that 9722 forbids. Yes, Congress entitled that provision sham transactions. But the text is what controls. It's not the title. And the text is any transaction. And if you can't get over that hump, you never get to the point of an 1114G court order. Second, Mr. Higgs cited a couple cases today. Chateau Gay, the Trump entertainment case that we're not cited in his brief. But I'm familiar with the Chateau Gay case. It deals with the definition of a claim. In other words, what is a claim for purposes of a discharge? And claims, as the Court probably knows, have to deal with when an issue arose. When did the right to a payment come into existence? And, yeah, in CERCLA, the courts have held that the right to payment came into existence at the time of the pollution or the enactment of CERCLA in the 1980s. But cases after Chateau Gay have gone on and said, but just because — but CERCLA is kind of a different beast. You can't get an exemption in bankruptcy to allow you to pollute however you want prospectively into the future. You know, you're dealing with something purely retrospective when you're dealing with what is the definition of a claim. Our case deals with those prospective obligations. The COAL Act says periodically, every month or every year, you will be assessed premiums as long as you remain in business. That's the same continuing obligation that the environmental laws impose on polluters. It's the same continuing obligation that the anti-discrimination laws impose on employers. And just because an employer may have discriminated against an employee 10 years ago and that employee has a claim in the bankruptcy does not mean that the bank should be court can forever immunize that debtor from discrimination liability in the future. And that is fundamentally what this case and this issue is about. Can a bank should be court forever immunize the debtor from having to pay COAL Act obligations prospectively? It happens to be in this case that Westmoreland went out of business, but not every coal company is going to go out of business. And on the courts, the bankruptcy court and 11th Circuit's interpretation of 1114, that coal company can go through, get laundered through bankruptcy and survive without any COAL Act obligations prospectively. Third point, the Any Injunction Act payments, the taxes here, the premiums are paid to a private fund. It is atypical nowadays for taxes to be paid to private individuals. But historically, the Any Injunction Act was adopted after the Civil War in the 1800s. There were things like taxes, tolls that were collected by private individuals under authority of law. And that's comparable to what's going on here. Fourth point, Mr. Hicks said everything is different in bankruptcy. That is a broad generalization. In our view, the only things that are different are the things that the bank should be code specifically says are different. And so it's not a safe assumption to put the burden on us to show why things should be the same. It's the burden on him to show why things are different. And finally, Mr. Hicks led off by identifying, claiming that this is a very high-stakes case that the whole company may very well have faltered if it weren't for the 1114 order or the 1114 decision here by this retiree committee. Respectfully, I disagree with that. In the proceedings below, we put on evidence that the coal companies paid about $650,000 a month in co-act obligations. The effect of the settlement here was to relieve the company of four months of paying their premiums, which is about $2 million. In other words, had we prevailed, the companies would have gone out of business four months later, and my clients would have been able to assess four additional months of premiums for $2 million. Westmoreland sold its mines for more than $1 billion. There is no way, rationally, that thousands of jobs were on the line over the $2 million that this case is ultimately about. And so I haven't been able to address all of the issues today. Unless the Court has questions about the other topics, we ask that for any one of the three reasons we've given in the brief, the Banksy Court's decision should be reversed. Thank you, Mr. McKillian. Your case is under submission. The Court will recess before completing the docket. Thank you.